**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**PADUCAH DIVISION**
**CIVIL ACTION NO. 5:15-CV-177-TBR**

PREFERRED CARE OF DELAWARE, INC., *et al.*                    Plaintiff,

v.

DOROTHY CROCKER, AS ATTORNEY-IN-FACT
OF FRANCES ELIZABETH TYLER                              Defendant.

**MEMORANDUM OPINION AND ORDER**

The parties have engaged in extensive briefing of this matter. The Plaintiffs filed this action pursuant to Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4, seeking to compel arbitration of Defendant Dorothy Crocker's state law claims and to enjoin the state court action under the Anti-Injunction Act, 28 U.S.C. § 2283. (Docket No. 1.) The three main disagreements between the parties facing the Court at this time are (1) Ms. Crocker's joinder of additional counter-defendants; (2) whether or not the parties' dispute is arbitrable; (3) whether or not this Court should grant an injunction enjoining the civil action in Trigg County Circuit Court. The Court will address these issues below. At the conclusion of this Opinion, the Court will individually address the multitude of motions filed in this action.


**Background**

Plaintiffs are all business entities associated with the Shady Lawn Nursing and Rehabilitation Center ("Shady Lawn"), a skilled nursing facility in Cadiz, Kentucky. (Docket No. 15-2 at 1-3.) Defendant Dorothy Crocker is the attorney-in-fact for Frances Elizabeth Tyler. (Docket Nos. 1 at 2; 23-3 at 1-3.) This dispute arises from injuries allegedly suffered by Ms. Tyler while in the care of Shady Lawn. (Docket No. 15-2 at 2.)

1

On July 7, 2015, Ms. Crocker filed an action in Trigg County Circuit Court against Shady Lawn Nursing and Rehabilitation Center, its administrator, and corporate owners and affiliates for injuries allegedly suffered by Ms. Tyler as a result of their alleged negligence. (Docket No. 16 at 1-2.) On August 7, 2015, the Plaintiffs filed this action in federal court to compel arbitration of Ms. Crocker's state law claims and to enjoin the state court proceedings. (Docket No. 1 at 1.) The Plaintiffs base their cause of action on the Alternative Dispute Resolution Agreement ("Arbitration Agreement") signed by Ms. Crocker as Attorney-In-Fact for Frances Tyler upon Ms. Tyler's admission to Shady Lawn. (Docket No. 1 at 3-8.) The Arbitration Agreement explicitly states that execution of the Agreement "is not a condition of admission to or continued residence" at Shady Lawn. (Docket No. 15-1 at1.) The Arbitration Agreement also states that it "applies to any and all disputes arising out of or in any way relating to this Agreement or to the Resident's stay at the Center that would constitute a legally cognizable cause of action in a court of law." (Docket No. 15-1 at 2.) The Arbitration Agreement commands that "[a]ll claims based in whole or in part on the same incident, transaction, or related course of care or service provided by the Center to the Resident shall be addressed in a single ADR process." (Docket No. 15-1 at 2.)

In response to the Plaintiffs' Complaint, Ms. Crocker filed an Answer and a Counterclaim. (Docket No. 5.) Ms. Crocker's counterclaim includes two claims: conspiracy and fraud. (Docket No. 5 at 14-18.) In her counterclaim, Ms. Crocker joined the following additional parties: "Preferred Care Health Facilities, Inc.; Preferred Care Management Services, Inc.; Dawn Tedder, in her capacity as Administrator of Shady Lawn Nursing and Rehabilitation Center; and Darla Joiner, in her capacity as Admissions Coordinator of Shady Lawn Nursing and Rehabilitation Center." (Docket No. 5 at 7.) With the exception of Darla Joiner, each of the

additional parties Ms. Crocker seeks to join were named as defendants in the underlying state-court action. (Docket No. 16 at 8.)

**Discussion**

I.   Joinder of Additional Counter Defendants

The Plaintiffs and several counter-defendants argue that Ms. Crocker's assertion of counterclaims against four parties not named in the Complaint is procedurally improper. (Docket Nos. 10 at 4; 18-1 at 3-4; 19-1 at 7-8; 28-1 at 4-5.) As a result, they seek to have this Court strike Ms. Crocker's counterclaims against these parties or simply dismiss her counterclaims. (Docket Nos. 10 at 4; 18-1 at 4; 19-1 at 7-8; 28-1 at 4.) In response, Ms. Crocker contends that "the Plaintiffs could not simply remove the pending state court case to this Court because the facility's administrator and Ms. Crocker are both Kentucky citizens," and therefore, this Court would not have had subject matter jurisdiction. (Docket No. 16 at 2.) Ms. Crocker argues that she correctly joined the four additional parties in this action. (Docket No. 16 at 6.) Furthermore, Ms. Crocker argues that both Dawn Tedder and Darla Joiner are necessary and indispensable parties. (Docket No. 16 at 9-15.) Consequently, she requests that this Court dismiss this action as she believes the joinder of Dawn Tedder and Darla Joiner will deprive this Court of subject matter jurisdiction because their joinder will destroy complete diversity. *Id.*

In their Motion to Strike, the Plaintiffs argue that Ms. Crocker's compulsory counterclaims against four nonparties are improper under Rule 13(a) of the Federal Rules of Civil Procedure because they were not originally part of the Federal Court complaint. (Docket No. 10 at 3-4.) Furthermore, Plaintiffs and several newly added counter-defendants argue that Ms. Crocker did not bring in the nonparties in accordance with Rule 14 of the Federal Rules of Civil Procedure which allows a defendant to bring in a third party "who is or may be liable to it

3

for all or part of the claim against it." Fed. R. Civ. P. 14(a); (*see also* Docket No. 10 at 4-5; 18-1 at 3-4; 19-1 at 7-8; 28-1 at 3-4.)

In her Response, Ms. Crocker argues that Rule 14 "has no application to [her] counterclaims against the existing and additional parties." (Docket No. 16 at 4.)[1] Furthermore, Ms. Crocker contends that she properly joined the additional nonparties under Rule 13(h) and Rule 19. Rule 13(h) of the Federal Rules of Civil Procedure states that "Rules 19 and 20 govern the addition of a person as a party to a counterclaim or crossclaim." Fed. R. Civ. P. 13(h). Ms. Crocker argues that under Rule 13(a)(1)(A), she "must assert her counterclaims that arise out of the same transaction or occurrence, otherwise those claims are lost." (Docket No. 16 at 7.) According to Ms. Crocker, the additional nonparties are necessary parties, and they were added in accordance with Rules 13(h) and 19. (Docket No. 16 at 7.) However, the inclusion of counterclaims against two of the nonparties, Dawn Tedder and Darla Joiner, destroys complete diversity as they and Ms. Crocker are citizens of Kentucky. (Docket No. 16 at 9.) It is because of their destruction of diversity that Ms. Crocker seeks to dismiss this action under Rule 12(b)(7) of the Federal Rules of Civil Procedure. (Docket No. 16 at 9-15.)

Plaintiffs acknowledge that Ms. Crocker's joinder of Dawn Tedder and Darla Joiner destroys complete diversity, but they respond that if this Court is to allow the joinder of these nonparties under Rules 13(h) and 19, their joinder will not divest this Court of subject matter jurisdiction because this Court has supplemental jurisdiction over Ms. Crocker's counterclaims. (Docket No. 26 at 10-12.)

The parties do not dispute that the Plaintiff's original complaint falls within this Court's jurisdiction. (*See* Docket Nos. 26 at 10; 31 at 6.) Under 28 U.S.C. § 1332, "district courts shall

---

[1] The Court agrees with Ms. Crocker that Rule 14 is irrelevant to her counterclaims which she seeks to bring under Rule 13(h) of the Federal Rules of Civil Procedure.

have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between citizens of different States."  The Supreme Court has stated that "[a] case falls within the federal district court's 'original' diversity 'jurisdiction' only if diversity of citizenship among the parties is complete, i.e., only if there is no plaintiff and no defendant who are citizens of the same State." *Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 388 (1998). The parties in the original complaint are completely diverse as the Plaintiffs are citizens of Delaware and Texas, and Ms. Crocker is a citizen of Kentucky. (Docket No. 1 at 2.) Furthermore, the amount in controversy exceeds $75,000. (Docket No. 1 at 2-3.) Yet, diversity jurisdiction cannot sustain Ms. Crocker's counterclaims against the four additional nonparties because the Defendant Ms. Crocker and the counter-defendants Dawn Tedder and Darla Joiner are all citizens of Kentucky.

Federal Rule of Civil Procedure 13(a) requires defendants to "state as a counterclaim any claim that . . . [they have] against an opposing party if the claim . . . arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require adding another party over whom the court cannot acquire jurisdiction." Fed. R. Civ. P. 13(a); *see also Bluegrass Hosiery, Inc. v. Speizman Indus., Inc.*, 214 F.3d 770, 772 (6th Cir. 2000). According to the Sixth Circuit Court of Appeals, "this rule serves the desirable goal of bringing all claims arising out of the same transaction or occurrence before the court in a single action." *Bluegrass Hosiery*, 214 F.3d at 772 (citing *United States v. Snider*, 779 F.2d 1151, 1157 (6th Cir. 1985)). Rule 13(h) provides for the joinder of additional parties to a party's counterclaim. Fed. R. Civ. P. 13(h). Federal Rule of Civil Procedure 13(h) states that "Rules 19 and 20 govern the addition of a person as a party to a counterclaim or crossclaim." Fed. R. Civ. P. 13(h). Generally, persons joined under Rule 13(h) as parties to a compulsory counterclaim under 13(a) fall under the

Court's supplemental subject-matter jurisdiction. 6 Charles Alan Wright et al., *Federal Practice and Procedure* §1436 (3d ed.), Westlaw (database updated April 2015). "Thus, a party can be added for purposes of adjudicating those claims *without regard to the party's citizenship or to whether the party is joined pursuant to Rule 19 or Rule 20*, since the party's presence will not be deemed to destroy the court's existing jurisdiction." *Id.* (emphasis added).

When a district court has original jurisdiction over a civil action, 28 U.S.C. § 1367(a) grants the district court "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." However, § 1367(b) limits a court's ability to exercise supplemental jurisdiction in certain situations. *See* 28 U.S.C. § 1367(b). Section 1367(b) states:

> In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

28 U.S.C. § 1367(b).  The Sixth Circuit Court of Appeals has reasoned that "[t]he supplemental jurisdiction provision, 28 U.S.C. § 1367(b), states congressional intent to prevent original plaintiffs—but not defendants or third parties—from circumventing the requirements of diversity." *Grimes v. Mazda N. Am. Operations*, 355 F.3d 566, 572 (6th Cir. 2004) (citing H.R. Rep. No. 101–734, at 29 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6860, 6875).  Additionally, the Sixth Circuit has stated that "[b]ecause defendants are involuntarily brought into court, their [claims a]re not deemed as suspect as those of the plaintiff, who is master of his complaint." *Id.*

6

(quoting *United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488, 493 (4th Cir. 1998)). Notably, when a defendant asserts a counterclaim, that does not make the defendant a plaintiff under 28 U.S.C. § 1367(b). *State Nat. Ins. Co. Inc. v. Yates*, 391 F.3d 577, 580 (5th Cir. 2004) (citing multiple decisions including *Grimes*, 355 F.3d at 572). The term "'plaintiff' in § 1367(b) refers to the original plaintiff in the action—not to a defendant that happens also to be a counter-plaintiff, cross-plaintiff, or third-party-plaintiff." *Yates*, 391 F.3d at 580. The Third, Fourth, and Fifth Circuit Courts of Appeal have addressed the question of a court's supplemental jurisdiction over a defendant's counterclaim against a non-diverse nonparty. *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 836-37 (3d Cir. 2011); *Yates*, 391 F.3d at 580; *Kapiloff*, 155 F.3d at 492-93. All three Circuits have found that supplemental jurisdiction does indeed allow the joinder of non-diverse counter-defendants. *Barefoot Architect*, 632 F.3d at 836-37; *Yates*, 391 F.3d at 580; *Kapiloff*, 155 F.3d at 492-93. As it appears that the Sixth Circuit has not ruled upon this very issue, this Court will follow the guidance of those circuits who have addressed this issue. Notably, one of this Court's fellow Sixth Circuit district courts has also found that the joinder of a non-diverse counter-defendant does not destroy subject matter jurisdiction as the court had supplemental jurisdiction over the counterclaim *See Orea Energy Grp., LLC v. E. Tennessee Consultants, Inc.*, No. 3:09-CV-041, 2009 WL 3246853, at *2 (E.D. Tenn. Oct. 6, 2009).

Here, Ms. Crocker asserts counterclaims against the Plaintiffs as well as four additional nonparties for conspiracy and fraud with regards to their involvement in procuring Ms. Crocker's signature and agreement in her capacity as the attorney-in-fact for Frances Elizabeth Tyler to arbitration. (Docket No. 5 at 14-15.) As the Plaintiffs brought this action to compel arbitration of the claims asserted by Ms. Crocker in state court and to enjoin those proceedings and Ms. Crocker's counterclaims directly concern the validity and enforceability of the arbitration

agreement at issue, this Court finds that Ms. Crocker's counterclaims "arise[] out of the transaction or occurrence that is the subject matter of the [Plaintiffs'] claim." Fed. R. Civ. P. 13(a). Therefore, Ms. Crocker's counterclaims are compulsory under Rule 13(a). Consequently, Ms. Crocker's counterclaims also satisfy § 1367(a)'s requirement that the additional claims "form part of the same case or controversy." 28 U.S.C. § 1367(a); *see also Branhaven, LLC v. BeefTek, Inc.*, 965 F. Supp. 2d 650, 662 (D. Md. 2013) (quoting *Smith v. James C. Hormel Sch. of Va. Inst. of Autism*, 3:08–CV–00030, 2010 WL 1257656, at *19 (W.D. Va. Mar. 26, 2010) ("Compulsory counterclaims under Fed. R. Civ. P. 13(a) always satisfy § 1367(a)'s 'same case or controversy' standard because they must satisfy the more stringent requirement that the counterclaim arise out of the same 'transaction or occurrence' as the jurisdiction-invoking claim."). Lastly, the limitations under § 1367(b) do not apply here as the Plaintiffs did not seek to join additional parties nor did they seek to assert claims against any additional parties. It is the Defendant Ms. Crocker who joined four additional parties including Dawn Tedder and Darla Joiner who are not diverse. *See* 28 U.S.C. § 1367(b). As the limitations under § 1367(b) apply only to *plaintiffs'* efforts to join non-diverse parties, it does not limit Ms. Crocker's joinder of the additional counter-defendants. Therefore, this Court finds that it has supplemental subject matter jurisdiction over Ms. Crocker's counterclaims against the newly added counter-defendants.

II.  Whether or Not the Parties' Dispute is Arbitrable

In addition to their procedural disputes, the parties substantively disagree as to whether or not this dispute is arbitrable *Masco Corp. v. Zurich Am. Ins. Co.*, 382 F.3d 624, 627 (6th Cir. 2004). Ms. Crocker makes a number of arguments against enforcement of the Arbitration Agreement. She argues that the Agreement is invalid because (A) she did not have the necessary authority to sign it; (B) the Plaintiffs and counter-defendants conspired to fraudulently induce her

8

to enter into the Agreement; (C) she did not knowingly, voluntarily, and intelligently waive her or Ms. Tyler's rights; (D) it lacked mutual obligation and therefore consideration; and (E) it lacked complete and definite terms. (Docket No. 23 at 5-21.) The Court will address each of these arguments below.

Congress enacted the United States Arbitration Act of 1925, more commonly referred to as the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, in response to the common law's hostility toward arbitration and the refusal of many courts to enforce arbitration agreements.[2] The United States Supreme Court has since interpreted the FAA as codifying "a national policy favoring arbitration when the parties contract for that mode of dispute resolution." *Preston v. Ferrer*, 552 U.S. 346, 349 (2008). The Supreme Court has further stated that the FAA's underlying purpose is to put arbitration agreements "upon the same footing as other contracts." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)). The FAA establishes a procedural framework applicable in

---

[2] Ms. Crocker has filed a Motion for Summary Judgment regarding the constitutionality of the FAA. (Docket No. 27.) Since Congress passed the FAA over 90 years ago, the United States Supreme Court has enforced and upheld the FAA as constitutional. Ms. Crocker specifically argues that the FAA violates one's Seventh Amendment right to a jury trial. *Id.* at 1-2. Ms. Crocker contends that "[b]ecause the FAA substitutes the knowing-and-voluntary requirement to waive constitutional rights and replaces it with the standard to enforce an ordinary contract, the FAA exceeds congressional authority and violates the separation-of-powers doctrine." *Id.* at 2. Ms. Crocker is adamant that a waiver of a constitutional right must be voluntarily, knowingly, and intelligently made. *Id.* at 6-8. Though the Sixth Circuit Court of Appeals has stated that its holdings in *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 507 (6th Cir. 2004), are applicable only "to the validity of arbitration clauses in employment agreements where an employee's statutorily created federal civil rights are issue," its findings regarding the Seventh Amendment right to a jury trial and arbitration agreements are helpful here. *Stutler v. T.K. Constructors Inc.*, 448 F.3d 343, 345 (6th Cir. 2006). In *Cooper*, the Sixth Circuit stated that it has "flatly rejected the claim that an arbitration agreement must contain a provision expressly waiving the employee's right to a jury trial." *Cooper*, 367 F.3d at 506. The Sixth Circuit also stated that "the loss of the right to a jury trial is a necessary and fairly obvious consequence of an agreement to arbitrate." *Id.* Importantly, according to the Sixth Circuit in *Cooper*, "[t]he Seventh Amendment confers not the right to a jury trial *per se*, but rather only the right to have a jury hear the case once it is determined that the litigation should proceed before a court. If the claims are properly before an arbitral forum pursuant to an arbitration agreement, the jury trial right vanishes." *Id.* (citations omitted) (internal quotation marks omitted). Several other circuits have echoed the Sixth Circuit's findings regarding the Seventh Amendment and the right to a jury trial and as such have declined to apply the heightened "knowing and voluntary" standard in evaluating a waiver of the right to a jury trial under an arbitration agreement. *See Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1371 (11th Cir. 2005); *American Heritage Life Ins. Co. v. Orr*, 294 F.3d 702, 711 (5th Cir. 2002); *Sydnor v. Conseco Fin. Servicing Corp.*, 252 F.3d 302, 307 (4th Cir. 2001); *Koveleskie v. SBC Capital Markets, Inc.*, 167 F.3d 361, 368 (7th Cir. 1999). Given the case law of the Sixth Circuit and our sister circuits, the Court finds that the FAA is constitutional and does not violate Ms. Crocker's Seventh Amendment right to a jury trial.

both federal and state courts and also mandates that substantive federal arbitration law be applied in both. *See Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265 (1995); *Southland Corp. v. Keating*, 465 U.S. 1, 16 (1984).

The FAA applies to any "contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction." 9 U.S.C. § 2. "The Supreme Court has interpreted the language 'involving commerce' in the FAA as signaling the broadest permissible exercise of Congress' Commerce Clause power." *Sun Healthcare Grp., Inc. v. Dowdy*, No. 5:13-CV-00169-TBR, 2014 WL 790916, at *11 (W.D. Ky. Feb. 26, 2014) (citing *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003)). Many cases have found that the FAA applies to arbitration agreements involving nursing home residents. *Id.* at 12. These cases recognize that "while the nursing care may occur wholly within the borders of Kentucky, the food, medicine, medical, and other supplies all likely come from elsewhere and that it would be impracticable for the nursing home to procure all goods necessary for the daily operations purely through intrastate channels." *Id.* (citing *GGNSC Louisville Hillcreek, LLC v. Warner*, 2013 WL 6796421, at *7–8 (W.D. Ky. December 19, 2013)). Additionally, the courts in these cases have noted that the complaint alleges that "foreign entities owned, operated, managed, controlled, and provided services for the nursing home." *Id.* Given this precedent, the Court finds that the FAA governs the Arbitration Agreement at issue.

Section 2 of the FAA, which governs the enforceability of arbitration agreements, provides that a written agreement to arbitrate disputes arising out a contract involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  Whereas § 2 of the FAA mandates enforcement, § 3 permits a party seeking to enforce an arbitration agreement to request that

10

litigation be stayed until the terms of the arbitration agreement have been fulfilled. 9 U.S.C. §§ 2-3. Section 4 goes on to provide the mechanism by which a party may petition a court to compel arbitration:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement. . . .  The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . . .  If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.

*Id.* § 4. Thus, before compelling arbitration, the Court "must engage in a limited review to determine whether the dispute is arbitrable." *Masco Corp.*, 382 F.3d at 627 (quoting *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003)). Such review, the Sixth Circuit advises, requires the Court to determine first whether "a valid agreement to arbitrate exists between the parties," and second whether "the specific dispute falls within the substantive scope of the agreement." *Id.* (quoting *Javitch*, 315 F.3d at 624). Arbitration agreements are fundamentally contracts and as such courts "review the enforceability of an arbitration agreement according to the applicable state law of contract formation." *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943–44 (1995)). As arbitration agreements are a "matter of contract[,] . . . a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Id.* (quoting *AT & T Techs. v. Communications Workers of Am.*, 475 U.S. 643, 648 (1986)).

A.  Ms. Crocker Lacked Necessary Authority

Ms. Crocker argues that this dispute is not arbitrable because she lacked the necessary authority to sign the Arbitration Agreement as Ms. Tyler's attorney-in-fact. (Docket No. 23 at 8.) Ms. Crocker contends that the Arbitration Agreement was not within the scope of the authority Ms. Tyler conferred upon her through Ms. Tyler's power of attorney. *Id.* She relies on two recent Kentucky Supreme Court cases to support her position: *Extendicare Homes, Inc. v. Whisman*, 478 S.W.3d 306, 312 (Ky. 2015), *as corrected* (Oct. 9, 2015), *and reh'g denied* (Feb. 18, 2016) and *Ping v. Beverly Enterprises, Inc.*, 376 S.W.3d 581, 587 (Ky. 2012). In response, the Plaintiffs argue that the FAA preempts the Kentucky Supreme Court's most recent decision in *Whisman*. (Docket No. 33 at 8-13.) This Court agrees with the Plaintiffs and finds that Kentucky's highest court's decision in *Whisman* violates the FAA.

The United States Supreme Court has described two specific situations where the FAA preempts a state law or rule. *Richmond Health Facilities v. Nichols*, 811 F.3d 192, 197 (6th Cir. 2016) (citing *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 341 (2011)). The first situation is "when a state law prohibits outright the arbitration of a particular type of claim." *Marmet Health Care Ctr., Inc. v. Brown*, 132 S. Ct. 1201, 1203 (2012) (quoting *Concepcion*, 563 U.S. at 341). The Court stated that in this situation "the analysis is straightforward: The conflicting rule is displaced by the FAA." *Id.* (quoting *Concepcion*, 563 U.S. at 341). The second situation occurs "when a doctrine normally thought to be generally applicable, such as duress or . . . unconscionability, is alleged to have been applied in a fashion that disfavors arbitration." *Concepcion*, 563 U.S. at 341. In this situation, the court "must determine whether the state law rule would have a 'disproportionate impact' on arbitration agreements." *Richmond Health Facilities*, 811 F.3d at 197 (citing *Concepcion*, 563 U.S. at 341-42). "This type of

12

disproportionate impact stand[s] as an obstacle to the accomplishment of the FAA's objectives." *Id.* at 197-98 (quoting *Concepcion*, 563 U.S. at 343) (internal quotation marks omitted).

In two recent rulings, the Kentucky Supreme Court has expounded upon the scope of authority conferred upon an attorney-in-fact by his principal in a power of attorney. *See Whisman*, 478 S.W.3d 306; *Ping*, 376 S.W.3d 581. Both cases involve an attorney-in-fact's decision to sign an arbitration agreement agreeing to arbitrate any claims against a nursing facility on behalf of his principal, the resident of the nursing facility. *Whisman*, 478 S.W.3d at 312; *Ping*, 376 S.W.3d at 586-88.

In *Ping*, the first of the two decisions, the Kentucky Supreme Court discussed the agency relationship created by a power of attorney between a principal and his attorney-in-fact. The court stated that an agency "is the fiduciary relation which results from the manifestation of consent by one person [the principal] to another [the agent] that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Ping*, 376 S.W.3d at 591 (quoting *Phelps v. Louisville Water Company*, 103 S.W.3d 46, 50 (Ky. 2003)). Specifically, "[a] power of attorney is a written, often formally acknowledged, manifestation of the principal's intent to enter into such a relationship with a designated agent." *Id.* (citing *Phelps*, 103 S.W.3d at 50). Though under the common law, the principal's death brought the agency relationship to an end, every state has now enacted a statute which allows individuals to create "a 'durable' power of attorney, an agency [relationship] . . . that would continue beyond the principal's incapacity." *Id.* (citations omitted). Kentucky Revised Statutes § 386.093 allows for a durable power of attorney but "does not address what authority may be granted therein. The scope of that authority is thus left to the principal to declare, and generally that declaration must be express." *Id.* at 592. According to the Commonwealth's highest court, "an agent's authority under a power of attorney

is to be construed with reference to the types of transaction expressly authorized in the document and subject always to the agent's duty to act with the 'utmost good faith.'" *Id.* (citing *Wabner v. Black*, 7 S.W.3d 379, 381 (Ky. 1999)). The court reasoned that its decisions on the relationship were consistent with the Restatement (Second) of Agency § 37 (1958), which states that "[t]he specific authorization of particular acts tends to show that a more general authority is not intended." *Ping*, 376 S.W.3d at 592. The court went on to note the Restatement (Third) of Agency § 2.02 comment h (2006), as it states that:

> [e]ven if a principal's instructions or grant of authority to an agent leave room for the agent to exercise discretion, the consequences that a particular act will impose on the principal may call into question whether the principal has authorized the agent to do such acts. Three types of acts should lead a reasonable agent to believe that the principal does not intend to authorize the agent to do the act. First are crimes and torts, . . . Second, acts that create no prospect of economic advantage for the principal, . . . Third, some acts that are otherwise legal create legal consequences for a principal that are significant and separate from the transaction specifically directed by the principal. A reasonable agent should consider whether the principal intended to authorize the commission of collateral acts fraught with major legal implications for the principal . . . .

*Id.* at 593. Based upon the aforementioned excerpt, the Kentucky Supreme Court reasoned that it "would place in [the] third category of acts with significant legal consequences a collateral agreement to waive the principal's right to seek redress of grievances in a court of law. Absent authorization in the power of attorney to settle claims and disputes or some such express authorization addressing dispute resolution, authority to make such a waiver is not to be inferred lightly." *Id.*

With regard to the power of attorney at issue in *Ping*, the court found that it did not authorize the attorney-in-fact to bind her principal to an *optional* Arbitration Agreement. The

14

court reasoned that if the arbitration agreement is not a requirement of admission to the nursing facility, but is instead optional, "the authority to choose arbitration is not within the purview of the health-care agency, since in that circumstance agreeing to arbitrate is not a health care decision." *Id.* (citations omitted) (citing multiple other state courts' decisions for support). Conversely, the court noted that "where an agreement to arbitrate is presented to the patient as a condition of admission to the nursing home . . . the authority incident to a health-care durable power of attorney includes the authority to enter such an agreement." *Id.* Additionally, the court ruled that when a power of attorney authorizes the agent to manage the principal's property and finances, "an optional nursing home arbitration agreement does not involve a financial decision" and, therefore, the principal is not authorized to enter into such an agreement on his principal's behalf. *Id.* at 594.

Several years after *Ping*, the Kentucky Supreme Court again addressed the limits of an agent's authority under a power of attorney in *Whisman*. *See Whisman*, 478 S.W.3d at 314-15. The court stated that "[w]ithout any doubt, one may *expressly* grant to his attorney-in-fact the authority to bargain away his rights to access the courts and to trial by jury by entering into a pre-dispute arbitration agreement." *Id.* at 329 (emphasis added). However, building on its analysis in *Ping*, the court held that it "will not . . . infer from the principal's silence or from a vague and general delegation of authority to 'do whatever I might do,' that an attorney-in-fact is authorized to bargain away his principal's rights of access to the courts and to a jury trial in future matters as yet not anticipated or even contemplated." *Id.* It grounded its decision in the belief that the right to a jury trial is "inviolate" and "sacred." *Id.* The court commanded that "the power to waive generally such fundamental constitutional rights must be unambiguously expressed in the text of

the power-of-attorney document in order for that authority to be vested in the attorney-in-fact." *Id.* at 328.

The court was adamant that "[t]here are limits to what [it] will infer from even the broadest grants of authority that might be stated in a power-of-attorney document." *Id.* It went on to consider the implications of holding that under a broad grant of authority in a power of attorney that the attorney-in-fact did indeed have the power to bind its principal to arbitration. *Id.* The court considered what its reaction would be if "other fundament rights" were at stake. *Id.* When considering other fundamental rights, the court stated that:

> [i]t would be strange, indeed, if [it] were to infer, for example, that an attorney-in-fact with the authority "to do and perform for me in my name all that I might if present to make any contracts or agreements that I might make if present" could enter into an agreement to waive the principal's civil rights; or the principal's right to worship freely; or enter into an agreement to terminate the principal's parental rights; put her child up for adoption; consent to abort a pregnancy; consent to an arranged marriage; or bind the principal to personal servitude. It would, of course, be absurd to infer such audacious powers from a non-specific, general, even universal, grant of authority. So too, it would be absurd to infer from a non-specific, universal grant, the principal's assent to surrender of other fundamental, *even sacred*, liberties.

*Id.* (emphasis in original). The court declared that "an attorney-in-fact may not waive his principal's fundamental constitutional rights absent an explicit power to do so." *Id.* at 330. The Kentucky Supreme Court ultimately concluded that "there are specific and concise grounds as exist at law or in equity, applicable to the formation of contracts generally, for establishing the invalidity of the . . . arbitration agreements at issue because each of them was signed by an agent lacking his principal's authority to bargain away fundamental constitutional rights." *Id.*

16

The Commonwealth's highest court applied its rule requiring that a power of attorney explicitly confer upon the attorney-in-fact the power to enter into arbitration agreements on the principal's behalf to the arbitration agreements at issue. The court found that the following language giving the agent the power "to draw, make, and sign any and all checks, *contracts*, notes, mortgages, agreements, or any other document including state and Federal tax returns" does not confer upon the agent the authority to enter into a pre-dispute arbitration agreement. *Id.* at 324-25. This exact language appears in the power of attorney that Ms. Tyler executed conferring upon her daughter Ms. Crocker the powers of an attorney-in-fact. (Docket No. 23-3 at 1.) In making its determination, the court stated that "an agent's authority under a power of attorney is to be construed with reference to the types of transaction expressly authorized in the document." *Whisman*, 478 S.W.3d at 324 (citing *Rice v. Floyd*, 768 S.W.2d 57, 58 (Ky. 1989)). The court found that this power "relates to the conduct of [the principal's] financial and banking affairs, and not to the vindication of unanticipated causes of action that might arise in the future." *Id.* at 324-25. Therefore, under Kentucky law, the aforementioned language is insufficient to create the power to sign arbitration agreements on the principal's behalf.

The Kentucky Supreme Court also considered the following language which conveys upon the power of attorney the right "[t]o institute or defend suits concerning [the principal's] property or rights." *Id.* at 318. Once again, this very language appears in the power of attorney that Ms. Tyler executed conferring upon her daughter Ms. Crocker the powers of an attorney-in-fact. (Docket No. 23-3 at 1.) The court found that "in both common and legal parlance" this language "manifests a specific intention to pursue one's right in the courts of law, not by private arbitration." *Whisman*, 478 S.W.3d at 323. The court went on to state that "[i]nstituting a suit is not the same thing as initiating a claim in arbitration; the two are mutually exclusive actions." *Id.*

The party seeking to enforce the arbitration argued that "the 'institute or defend suits' language of the [power of attorney] is a general authorization for engaging in litigation, which implicitly provides the authority to do whatever is incidental to the suit or reasonably necessary to achieve the purpose of the litigation." *Id.* at 323-24. The court responded to that argument by finding that "[a]n arbitration agreement signed *before* a cause of action exists cannot be 'reasonably necessary' [or incidental] to the resolution of that cause." *Id.* at 324 (emphasis in original). Consequently, under Kentucky law, giving one's attorney-in-fact the power to "institute or defend suits" does not confer upon him the power to sign an arbitration agreement on the principal's behalf.

At the end of its opinion, the Kentucky Supreme Court addressed *Whisman*'s impact on arbitration agreements and its compliance with the FAA. The court pronounced its belief that its ruling is consistent with the FAA and the United States Supreme Court's decision in *Concepcion*, as it "decline[s] to compel arbitration only when the assent of a party, purportedly bound by the agreement, has not been validly obtained." *Id.* at 330. It noted that "[n]ursing home facilities may still enforce arbitration agreements with their residents when the resident has signed the agreement or validly authorized his agent to sign in his stead." *Id.* The Kentucky Supreme Court did not declare a prohibition against an attorney-in-fact's ability to bind his principal to arbitrate claims in the nursing home context, rather, the court declared that a principal's grant of such an authority must be expressly included in the power of attorney. The court expressed its opinion that its decision "stands in stark contrast to the blanket prohibitions against arbitration agreements condemned [by the Supreme Court] in *Marmet* and *Concepcion*." *Id.* at 331.

This Court must now consider whether or not the Kentucky Supreme Court's recent decision in *Whisman* violates the FAA. This Court finds that the rule established in *Whisman*

does not violate the first level of inquiry under *Concepcion*. The Kentucky Supreme Court's decision "does not categorically prohibit [the] arbitration" of claims arising from nursing home care. *Richmond Health Facilities*, 811 F.3d at 198. Nothing in *Whisman* precludes nursing home residents or their attorneys-in-fact from entering into arbitration agreements with nursing care facilities upon admission. The Kentucky Supreme Court's requirement that a power of attorney contain an explicit authorization is distinguishable from *Marmet* where a West Virginia law stated that "an arbitration clause in a nursing home admission agreement adopted prior to an occurrence of negligence that results in a personal injury or wrongful death, shall not be enforced to compel arbitration of a dispute concerning the negligence." *Marmet Health Care Ctr., Inc. v. Brown*, 132 S. Ct. 1201, 1203 (2012). Unlike in *Marmet*, the Kentucky Supreme Court's rule does not "prohibit[] outright the arbitration of a particular type of claim." *Concepcion*, 563 U.S. at 341. Consequently, this Court must continue on to the second "more complex" inquiry under *Concepcion* to determine if Kentucky's highest court's rule violates the FAA.

After much consideration, this Court finds that Kentucky's requirement that a power of attorney explicitly enumerate an attorney-in-fact's power to sign an arbitration agreement violates the FAA as it fails the second inquiry under *Concepion*. The second inquiry requires the Court to determine whether or not the state law rule has a "disproportionate impact" on arbitration agreements, "when a doctrine normally thought to be generally applicable, such as duress or . . . unconscionability, is alleged to have been applied in a fashion that disfavors arbitration." *Concepcion*, 563 U.S. at 341-42. "Although § 2 [of the FAA] . . . preserves generally applicable contract defenses, nothing in it suggests an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives." *Id.* at 343 (citations omitted). The Supreme Court has cautioned that "a court may not rely on the uniqueness of an

agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable, for this would enable the court to effect what . . . the state legislature cannot." *Id.* at 341 (citing *Perry v. Thomas*, 482 U.S. 483, 493 n.9 (1987)).

The Court finds the facts of this case to be analogous to those in *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681 (1996). In that case, the Supreme Court concluded that a Montana statute, which required notice that a contract was subject to arbitration "be typed in underline capital letters on the first page of the contract," violated the FAA. *Doctor's Associates*, 517 U.S. at 684. The Supreme Court stated that "[c]ourts may not . . . invalidate arbitration agreements under state laws applicable only to arbitration provisions." *Doctor's Associates*, 517 U.S. at 687 (first citing *Allied-Bruce Terminix Cos. V. Dobson*, 513 U.S. 265, 281 (1995); then citing *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987)). Furthermore, the Court found that "[b]y enacting § 2 [of the FAA], . . . Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed upon the same footing as other contracts." *Id.* (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974)) (internal quotation marks omitted). By enacting the requirement that a power of attorney expressly include an attorney-in-fact's authority to enter into a pre-dispute arbitration agreement, the Kentucky Supreme Court, like the Montana legislature, is singling out arbitration for "suspect status." When a power of attorney gives an attorney-in-fact an extremely broad grant of authority or the specific authority to enter into contracts or to institute or defend suits that authority must include the power to contract for arbitration.  *See Brookdale Sr. Living Inc. v. Stacy*, 27 F. Supp. 3d 776, 790-91 (E.D. Ky. 2014); *Oldham v. Extendicare Homes, Inc.*, No. 5:12-CV-00199, 2013 WL 1878937, at *3-5 (W.D. Ky. May 3, 2013); *GGNSC Vanceburg, LLC v. Taulbee*, No. 5:13-CV-71-KSF, 2013 WL 4041174, at *8-9 (E.D. Ky. Aug. 7, 2013) (finding distinguishable from *Ping* powers of attorney

that authorized the attorney-in-fact to contract and to institute and defend suits on behalf of the principal).

This Court finds Justice Abramson's dissent in *Whisman* to be both persuasive and informative. In her dissent, Justice Abramson observed that while "[t]he majority disavows . . . any intent to single out arbitration agreements and claims merely to be creating a general rule to the effect that an agent cannot waive the principal's constitutional rights without 'express' and 'specific' authority to do so[,]" it does in fact single out arbitration agreements. *Whisman*, 478 S.W.3d 351 (Abramson, J., dissenting). She noted that "[a]gents . . . make innumerable decisions implicating and compromising the principal's fundamental rights to enter particular contracts and to acquire and protect particular forms or items of property, and they do so on the basis of general grants of authority to contract and to handle property." *Id.* at 352. Therefore, "if the majority's new rule requiring 'express' and 'specific' authority for an agent to compromise the principal's constitutional rights were truly meant to apply generally, . . . to say that the majority has revolutionized [Kentucky's] agency law would be a gross understatement." *Id.* If indeed the new rule does not apply generally, as Justice Abramson suggested that surely it does not, then it must apply as the majority opinion suggested "only to 'sacred' constitutional rights, of which, according to the majority, Kentucky has but one – the right to a jury trial." *Id.* at 353. If the new rule established by the court only applies "to that one right, *the one right that just happens to be correlative to the right to arbitrate*, then the rule . . . clearly run[s] afoul of the FAA, because it would operate disproportionately, if not exclusively, to prevent the enforcement of arbitration agreements." *Id.* (emphasis in original).

Justice Abramson then analyzed the majority's other examples of instances in which a broad grant of authority would not be seen to authorize the attorney-in-fact to give up the

principal's "fundamental constitutional rights." *Id.*at 353-54. She stated that the majority's examples suggest that "an agent's committing a principal to arbitration is just as outrageous and as worthy of judicial skepticism and intervention as an agent's committing a principal to an arranged marriage, personal servitude or a criminal conviction," just a few of the other "fundamental constitutional rights" mentioned by the majority. *Id.* at 353. This Court agrees with Justice Abramson that "[t]o state the comparison as the majority does is to make plain the hostility to arbitration that gives rise to it." *Id.* Notably, Justice Abramson highlighted the important differences between the other examples provided by the majority opinion and an attorney-in-fact's execution of a pre-dispute arbitration agreement. In her explanation, Justice Abramson stated the following:

> Unlike the majority's examples, all of which suppose the waiver or compromise of a basic, personal substantive right (rights that an ordinary attorney-in-fact is rarely, if ever, asked to address on the principal's behalf), arbitration agreements, which are commonplace these days, involve no substantive waiver. The principal's substantive rights remain intact, only the forum for addressing those rights is affected. The majority's apparent presumption that the arbitration agreement has substantive implications adverse to the principal (and thus belongs on the list of hard-to-waive substantive rights) is the very presumption Congress sought to counteract with the FAA.
>
> Thus, while it may well be possible to frame a rule under state law to the effect that a presumption exists against an agent's authority to waive certain substantive rights of the principal, it does not follow that state law would include the right to civil trial among those presumptively non-waivable rights; and even if, as the majority would have it, the state rule did purport to hold sacrosanct the principal's right to trial in civil cases, under *Concepcion* and the FAA, the saving clause of which is not to be construed as a self-destruct mechanism, that aspect of the state rule would be preempted by federal law

*Id.* at 353-54. This Court agrees with Justice Abramson's analysis of the juxtaposition between the majority's examples and an agent's execution of a pre-dispute arbitration agreement as well as with her ultimate conclusion, which is in accordance with the United States Supreme Court's

precedent, that "what state law cannot do directly—disfavor arbitration—it also cannot do indirectly by favoring arbitration's correlative opposite, a judicial trial." *Id.* at 354.  As that is the "express purpose of the rule" created by the majority decision of the Kentucky Supreme Court and "the application of that rule will clearly have a disproportionate effect on the ability of agents to enter arbitration agreements (as opposed to other contracts)," the rule violates the FAA. *Id.*

Though the second inquiry under *Concepcion* is "more complex," this Court believes that the Kentucky Supreme Court's decision in *Whisman* fails the second inquiry and, therefore, is invalid. The rule established by Kentucky's highest court conflicts with the goals and policies of the FAA, as they are "antithetical to threshold limitations placed specifically and solely on arbitration." *Doctor's Associates*, 517 U.S. at 688. The Kentucky Supreme Court's requirement that a principal in his power of attorney explicitly convey to an attorney-in-fact the right to enter into a pre-dispute arbitration agreement "places arbitration agreements in a class apart from 'any contract,' and singularly limits their validity." *Id.* Consequently, the court's rule is "inconsonant with, and is therefore preempted by, the federal law." *Id.*

With regards to Ms. Tyler's power of attorney, it gives Ms. Crocker the power "*to draw, make and sign any and all* checks, *contracts*, notes, mortgages, agreements, or any other document including state and Federal tax returns" on Ms. Tyler's behalf. (Docket No. 23-2 at 1 (emphasis added).) It also gives Ms. Crocker the authority to "institute or defend suits concerning [Ms. Tyler's] property or rights." *Id.* The Court finds that this language conveys upon Ms. Crocker the authority to sign a pre-dispute arbitration agreement on Ms. Tyler's behalf. *See Sorrell v. Regency Nursing, LLC*, No. 3:14-CV-00304-TBR, 2014 WL 2218175, at *3 (W.D. Ky. May 28, 2014); *Oldham v. Extendicare Homes, Inc.*, 2013 WL 1878937, at *3-5.

The Court has struggled with this issue. At first glance, it appears rather simple but obviously it is much more complex. Certainly, the Supreme Court of Kentucky realized the complexity of the issue as it could not reach a unanimous decision. Frankly, this Court is troubled and hesitant in disagreeing with the majority of the Kentucky Supreme Court. This Court respects and values the decisions of Kentucky's highest court. This is a close call, but ultimately, the Court respectfully disagrees with the Kentucky Supreme Court. Perhaps it is a case in which reasonable minds just disagree.

### B. Arbitration Agreement Procured By Fraud

In her counterclaim, Ms. Crocker alleges that the counter-defendants conspired to fraudulently induce her to execute the Arbitration Agreement at issue. (Docket No. 5 at 16-17.) According to the United States Supreme Court, "a court, rather than an arbitrator, may adjudicate a claim of fraud in the inducement only if the claim of fraud concerns the inducement of the arbitration clause itself, not the inducement of the contract generally." *Burden v. Check Into Cash of Kentucky, LLC*, 267 F.3d 483, 488 (6th Cir. 2001) (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967)). "If a party challenges the validity under § 2 [of the FAA] of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71 (2010). According to case law precedent, this Court must consider Ms. Crocker's allegations that she was fraudulently induced to sign the Arbitration Agreement before compelling the parties to arbitration. To determine whether or not Ms. Crocker was fraudulently induced to execute the Arbitration Agreement, this Court must turn to Kentucky contract law. *Davis v. Glob. Client Sols.*, LLC, 765 F. Supp. 2d 937, 940 (W.D. Ky. 2011) (citing *Johnson v.*

*Career Sys. Dev./DJI Joint Venture*, No. 4:09CV–76–M, 2010 WL 292667, at *2 (W.D. Ky. Jan. 20, 2010)).

The Plaintiffs and several of the newly added counter-defendants have filed motions to dismiss Ms. Crocker's fraud and civil conspiracy claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim. (Docket Nos. 15; 18; 19; 28.)  A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  In order to survive a motion to dismiss under Civil Rule 12(b)(6), a party must "plead enough 'factual matter' to raise a 'plausible' inference of wrongdoing."  *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A claim becomes plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  Should the well-pleaded facts support no "more than the mere possibility of misconduct," then dismissal is warranted.  *Id.* at 679.  The Court may grant a motion to dismiss "only if, after drawing all reasonable inferences from the allegations in the complaint in favor of the plaintiff, the complaint still fails to allege a plausible theory of relief."  *Garceau v. City of Flint*, 572 F. App'x 369, 371 (6th Cir. 2014) (citing *Iqbal*, 556 U.S. at 677–79).

In Kentucky, "[a] fundamental rule of contract law holds that, absent fraud in the inducement, a written agreement duly executed by the party to be held, who had an opportunity to read it, will be enforced according to its terms." *Schnuerle v. Insight Commc'ns Co., L.P.*, 376 S.W.3d 561, 575 (Ky. 2012) (quoting *Conseco Finance Servicing Corp. v. Wilder*, 47 S.W.3d 335, 341 (Ky. Ct. App. 2001)). The Kentucky Supreme Court commands that "one who signs a

contract is presumed to know its contents, and that if he has an opportunity to read the contract which he signs he is bound by its provisions, unless he is misled as to the nature of the writing which he signs or his signature has been obtained by fraud." *Sorrell v. Regency Nursing, LLC*, No. 3:14-CV-00304-TBR, 2014 WL 2218175, at *7 (W.D. Ky. May 28, 2014) (quoting *Hathaway v. Eckerle*, 336 S.W.3d 83, 89–90 (Ky. 2011)). Importantly, under Kentucky law, "negligence in failing to read the contract prevents any reliance on oral representations at the time of signing." *Id.* at 8 (quoting *Cline v. Allis–Calmers Corp.*, 690 S.W.2d 764, 767 (Ky. Ct. App. 1985)). "As a rule, if a party is able to read and has a chance to do so, but omits this precaution because of his adversarys' [sic] statements, as to the contents of the instrument, his negligence will estop him from claiming that the instrument is not binding." *Id.* (quoting *Mayo Arcade Corp. v. Bonded Floors Co.*, 41 S.W.2d 1104, 1109 (Ky. 1931)). Kentucky courts have long recognized that:

> [o]ne sui juris and in possession of his faculties, contracting at arm's length, and who is able to read and write, is not permitted by the law to rely exclusively upon the statements of the other contracting party as to the contents of a writing which the former signs. There must be something said or done by the party charged with the fraud which would be reasonably calculated to disarm or deceive one of ordinary prudence and to prevent him from using such diligence as an ordinarily prudent man would use in the execution of a contract under the same or similar circumstances. When, therefore, the law speaks of misrepresentations by the party charged with the fraud, it means that the representations must have been not only untrue, but also made under such circumstances as would be reasonably calculated to deceive one while exercising ordinary care for his own protection.

*Holifield v. Beverly Health & Rehab. Servs., Inc.*, No. CIV.A. 3:08CV-147-H, 2008 WL 2548104, at *3 (W.D. Ky. June 20, 2008) (quoting *Kreate v. Miller*, 11 S.W.2d 99, 102 (Ky. 1928)).

A party seeking to recover for fraud in the inducement must allege six elements of fraud. Those six elements are as follows: "1) material representation 2) which is false 3) known to be false or made recklessly 4) made with inducement to be acted upon 5) acted in reliance thereon and 6) causing injury." *PCR Contractors, Inc. v. Danial*, 354 S.W.3d 610, 613 (Ky. Ct. App. 2011) (quoting *Bear, Inc. v. Smith*, 303 S.W.3d 137, 142 (Ky. Ct. App. 2010)). Additionally, the plaintiff's reliance on the material representation must be reasonable. *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009) (citing *McHargue v. Fayette Coal & Feed Company*, 283 S.W.2d 170 (Ky. 1955)).

One may assert a claim civil conspiracy in concert with a claim for fraud. Civil conspiracy "is not a free-standing claim; rather, it merely provides a theory under which a plaintiff may recover from multiple defendants for an underlying tort." *See Stonestreet Farm, LLC v. Buckram Oak Holdings*, N.V., No. 2008-CA-002389-MR, 2010 WL 2696278, at *13 (Ky. Ct. App. July 9, 2010) (citing *Davenport's Adm'x v. Crummies Creek Coal Co.*, 184 S.W.2d 887, 888 (Ky. 1945)). Civil conspiracy is defined as "a corrupt or unlawful combination or agreement between two or more persons to do by concert of action an unlawful act, or to do a lawful act by unlawful means." *Peoples Bank of N. Kentucky, Inc. v. Crowe Chizek & Co. LLC*, 277 S.W.3d 255, 261 (Ky. Ct. App. 2008) (quoting *Smith v. Board of Education of Ludlow*, 94 S.W.2d 321, 325 (Ky. 1936)). In Kentucky, to prevail on a claim for civil conspiracy, the proponent must show an unlawful/corrupt combination or agreement between the alleged conspirators to do by some concerted action an unlawful act. *Id.* (citing *Montgomery v. Milam*, 910 S.W.2d 237, 239 (Ky. 1995)). Kentucky courts have focused on the meaning of "concerted action." The Kentucky Court of Appeals recently explained that:

Kentucky's highest court provided direction as to the necessary components of a conspiracy in the case of *Davenport's Adm'x v. Crummies Creek Coal Co.* [299 Ky. 79, 184 S.W.2d 887 (Ky. 1945) ] in which the decedent's personal representative sued a coal company alleging that a conspiracy was formed between the company and its employees to commit a wrongful act resulting in the death of an innocent party. The Court held that before a conspiracy can be found, a "necessary allegation is that the damage or death resulted from some overt act done pursuant to or in furtherance of the conspiracy." The Court acknowledged that there is no such thing as a civil action for conspiracy, noting that the action is for damages caused by acts committed pursuant to a formed conspiracy. In the absence of such acts done by one or more of the conspirators and resulting in damage, no civil action lies against anyone since *the gist of the civil action for conspiracy is the act or acts committed in pursuance of the conspiracy, not the actual conspiracy.*

*Kloiber v. Daniel Kloiber Dynasty Trust*, No. 2013-CA-000436-MR, 2014 WL 6882265, at *6 (Ky. Ct. App. Dec. 5, 2014) (emphasis added). Kentucky's courts have looked to the Restatement (Second) of Torts, § 876 (1979) to provide clarity on the meaning of "concert of action." The Restatement provides the following explanation:

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct separately considered, constitutes a breach of duty to the third person.

*Peoples Bank*, 277 S.W.3d at 261 (citing Restatement (Second) of Torts § 876). In compliance with the Restatement's definition, Kentucky's courts have held that to satisfy the "concert of action" requirement "there must be proof that the defendants acted tortiously pursuant to a common design, or that they rendered substantial assistance to others to accomplish the tortious act." *Id.* "[M]ere negligence [on the part of the defendants] is not sufficient to support a claim for civil conspiracy." *Id.*

In her Counterclaim, Ms. Crocker alleges that the counter-defendants "conspired to conceal material facts concerning the admissions paperwork and the existence of an arbitration agreement, misrepresented the arbitration agreement as part of routine admissions paperwork, and omitted material facts concerning the admissions paperwork and the arbitration agreement." (Docket No. 5 at 16.) Specifically, Ms. Crocker alleges that she "was never informed of the existence of an arbitration agreement . . . [or] that signing an arbitration agreement was optional." *Id.* Ms. Crocker claims that she was "told that all paperwork she was presented during the admission process required her signature in order for Ms. Tyler to remain in the facility." *Id.* Ms. Crocker contends that the Arbitration Agreement was misrepresented as being merely part of the routine admissions paperwork. *Id.* Ms. Crocker states that she completed all of the admissions paperwork within a span of ten minutes and signed numerous documents during that time. *Id.* She argues that she "was never given a meaningful opportunity to read or review the admissions paperwork, including the arbitration agreement." *Id.* She also alleges that she was never informed of the consequences of a signing the Arbitration Agreement. *Id.*

Following her recitation of the facts at issue, Ms. Crocker states that the information provided by the counter-defendants during the admissions process was "false and misleading, in that the arbitration agreement was a separate and distinct agreement that was not required to be signed in order for Ms. Tyler to remain at the facility." *Id.* at 17. Ms. Crocker alleges that the counter-defendants either knew that Ms. Crocker's signature was not required for Ms. Tyler to remain at the facility or they acted with reckless disregard as to whether Ms. Crocker's signature was required. *Id.* at 18. Furthermore, Ms. Crocker asserts that "she relied to her detriment" on the information provided by the counter-defendants, and she believed that "all material information concerning the paperwork she was being forced to sign in order for Ms. Tyler to be admitted at

29

the facility would be disclosed and otherwise would not have signed the arbitration agreement." *Id.* at 17. Lastly, she contends that the counter-defendants engaged in the alleged conduct "intending for residents and their responsible parties . . . to rely on the truth of their statements and to rely on the fact that all material information concerning the admissions process would be disclosed in deciding whether to sign the admissions paperwork." *Id.*

After reviewing Ms. Crocker's counterclaims and considering Ms. Crocker's factual allegations as true, which the Court must do at this stage of litigation,  the Court finds that she has provided sufficient allegations to barely survive the counter-defendants' Motions to Dismiss. While Ms. Crocker's allegations may not be sufficient after discovery, at this stage of litigation, her complaint successfully pleads the claims of fraud and civil conspiracy.[3]

### C.  Knowing, Voluntarily, and Intelligent Waiver

Ms. Crocker further argues that the Arbitration Agreement is unenforceable because "it is not the product of a knowing, voluntary, and intelligent waiver." (Docket No. 23 at 15.)

The Sixth Circuit Court of Appeals requires that employees signing an arbitration agreement waiving their right to a jury trial of any prospective federal civil rights claims must do so knowingly, voluntarily, and intelligently. *See, e.g., Tillman v. Macy's, Inc.*, 735 F.3d 453, 461 (6th Cir. 2013); *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 973 (6th Cir. 2007);

---

[3] Ms. Crocker has also filed a Motion for Summary Judgment on her counter claims for fraud and conspiracy. (Docket Nos. 23; 24.) Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  In their Response to Ms. Crocker's Motion for Summary Judgment, the counter-defendants provide an affidavit by Ms. Darla Joiner, who presented the admissions paperwork to Ms. Crocker on the date in question. (Docket No. 37-1.) Ms. Joiner's affidavit demonstrates that there is a genuine dispute as to several material facts. The parties do not agree as to the circumstances surrounding the acquisition of Ms. Crocker's signature on the Arbitration Agreement. (*See* Docket Nos. 24 at 5-8 ; 24-1 at 1-3; 37 at 8-10; 37-1 at 1-3.) As Ms. Crocker has failed to show the absence of a genuine dispute of material fact.

*Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370, 381 (6th Cir. 2005) *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 668 (6th Cir. 2003) (en banc). However, it appears that the Sixth Circuit has not expanded this requirement beyond an employee's waiver of his or her right to pursue employment claims in federal court. In *Stutler v. T.K. Constructors Inc.*, homeowners filed a complaint against their construction company for problems that arose after the construction of their residence. 448 F.3d 343, 344 (6th Cir. 2006). The homeowners' complaint contained a variety of state law claims including negligence and breach of contract. *Id.* In determining the enforceability of the arbitration clause, the Sixth Circuit found that the district court "erred by applying federal common law rather than considering state law contract defenses." *Id.* The district court relied on the following two Sixth Circuit opinions: *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646 (6th Cir. 2003) and *Cooper v. MRM Investment Co.*, 367 F.3d 493 (6th Cir. 2004), in its denial of the construction company's motion to compel arbitration. The Sixth Circuit began its analysis by explicitly limiting the applicability of its holdings in *Morrison* and *Cooper* "to the validity of arbitration clauses in employment agreements where an employee's statutorily created federal civil rights are at issue." *Id.* at 345. The court concluded that "[u]nder the FAA, the [homeowners] must look to contract defenses available in Kentucky rather than those found in federal common law." *Id.* at 346. The Sixth Circuit reasoned that

> [e]ven if *Morrison* and *Cooper* were not explicitly limited to the arbitration of federal statutory rights, *Erie R. Co. v. Tompkins* forbids their application to a question governed by state law. 304 U.S. 64, 58 (1938). *Erie* provides that "[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state." *Id.* at 78. Although the FAA generally preempted states' laws that are inconsistent with the FAA, Congress explicitly preserved the applicability of state law defenses to arbitration agreements. 9 U.S.C. § 2; *Perry v. Thomas*, 482 U.S. 483, 492 n. 9 (1987). Accordingly, the [homeowners'] ability to avoid their agreement

31

> with [the construction company] is governed by the generally applicable contract laws of the Commonwealth of Kentucky. We cannot, under *Erie*, invalidate that agreement by reference to the federal common law established by . . . *Morrison* and *Cooper*.

Here, the Plaintiffs seek to compel arbitration of Ms. Crocker's state law claims currently before the Trigg County Circuit Court. (Docket Nos. 1; 1-3.) Therefore, this Court must not use federal common law and must instead use Kentucky's common law contract defenses to determine if the Arbitration Agreement is valid. The Kentucky Court of Appeals has stated that it is "unpersuaded that in order for a party to be bound by an arbitration clause that his acquiescence to the agreement must be proven under the same standards applicable to a defendant's waiver of a constitutional right in a criminal case." *Dutschke v. Jim Russell Realtors, Inc.*, 281 S.W.3d 817, 824 (Ky. Ct. App. 2008). In other words, the "standard for evaluating [the] validity of an arbitration clause does not require an affirmative demonstration that the contract was freely, voluntarily, and knowingly entered into." *Kindred Healthcare, Inc. v. Fields*, No. 2013-CA-001901-MR, 2015 WL 4153629, at *3 (Ky. Ct. App. July 10, 2015) (citing *Dutschke v.*, 281 S.W.3d at 824. The Plaintiffs have provided *prima facie* evidence that a valid Arbitration Agreement exists, and under Kentucky law, this Court need not inquire into whether or not the arbitration clause was "freely, voluntarily, and knowingly" entered into in order to determine its validity.

### D.  Lack of Consideration

Ms. Crocker also contends that the Arbitration Agreement is "invalid because it is one-sided . . . [as] only an individual like Ms. Crocker . . . is being denied access to the courts under this agreement. (Docket No. 23 at 15.) She points to the Plaintiffs' commencement of this action pursuant to Section 4 of the FAA as proof that they are not equally bound to arbitration. *Id.*

Furthermore, Ms. Crocker argues that the disputes subject to arbitration are only those that would be brought by a resident of the nursing facility and the exemptions in the Arbitration Agreement are those that would be brought by the nursing facility. *Id.* The Arbitration Agreement states that "[t]his Agreement applies to any and all disputes arising out of or in any way relating to this Agreement or to the Resident's stay at the Center that would constitute a legally cognizable cause of action in a court of law sitting in the Commonwealth of Kentucky" and goes on to provide an illustrative but not exhaustive list of such claims. (Docket No. 15-1 at 2.) At the end of the relevant paragraph, there is a list of disputes that are not subject to the Arbitration Agreement. Those exempted disputes include "(1) involuntary discharge actions initiated by the Center; (2) guardianship proceedings resulting from Resident's alleged incapacity; and (3) disputes involving amounts less than $2,000.00." *Id.* Ms. Crocker claims that the only claims that the center may have against a resident have been "intentionally exempted from the scope of arbitration." (Docket No. 23 at 16.)

According to the Kentucky Supreme Court, consideration is one of the fundamental elements of a valid contract. *Energy Home, Div. of S. Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 834 (Ky. 2013) (citing *Commonwealth v. Morseman*, 379 S.W.3d 144, 149 (Ky. 2012)). Kentucky's highest court has found that "an arbitration clause requiring both parties to submit equally to arbitration constitutes adequate consideration." *Id.* at 835 (first citing *Kruse v. AFLAC Intern., Inc.*, 458 F. Supp. 2d 375, 385 (E.D. Ky. 2006); then citing *Shadeh v. Circuit City Stores, Inc.*, 334 F. Supp. 2d 938, 941 (W.D. Ky. 2004)). Here, both parties are bound to arbitrate all but three types of claims. Despite Ms. Crocker's characterization of the Agreement, this Court finds that there is not an incongruity in the obligations of the parties to submit "any and all disputes arising out of or in any way relating to [the Arbitration] Agreement or to the Resident's stay at

the Center" to Arbitration. (Docket No. 15-1 at 2.) The exclusion of disputes involving a relatively small sum of money and involuntary discharge actions initiated by the Center does not make the Arbitration Agreement "one-sided" or lack valid consideration.

### E.  Lack of Complete and Definite Terms

Ms. Crocker further contends that the Arbitration Agreement should not be enforced because there is insufficient identity of the parties in the agreement and, therefore, the terms are not definite and certain as required under Kentucky law. (Docket No. 23 at 18-19.) She states that "none of the Plaintiffs, nor any other of Preferred Care's multiple operating entities, are identified anywhere in the agreement." *Id.* at 19. She contends that "the only nursing home company identified by name in [the Arbitration] [A]greement is not Preferred Care at all, but rather Extendicare Health Services, Inc." *Id.*

The Sixth Circuit Court of Appeals has stated that "it is well-established that any doubts regarding arbitrability must be resolved in favor of arbitration because there is a strong presumption in favor of arbitration under the FAA." *Glazer v. Lehman Bros.*, 394 F.3d 444, 450 (6th Cir. 2005) (citations omitted). Courts are to resolve any ambiguities in the language of an arbitration agreement in favor arbitration. *Id.* With the federal presumption in favor of arbitration in mind, this Court must employ state law contract principles to determine whether or not the Arbitration Agreement is enforceable. *Indus. Servs. of Am., Inc. v. Abcom Trading Pte. Ltd.*, 869 F. Supp. 2d 807, 812 (W.D. Ky. 2012) (citing *Floss v. Ryan's Fam. Steak Houses, Inc.*, 211 F.3d 306, 314 (6th Cir. 2000)).

In Kentucky, "[o]ne of the essential elements of a contract, if not the most essential element, is the requirement that there be an agreement between the parties." *Cox v. Ford*, No.

2014-CA-000961-MR, 2015 WL 9413404, at *2 (Ky. Ct. App. Dec. 23, 2015) (quoting *King v. Ohio Valley Fire & Marine Ins. Co.*, 280 S.W. 127, 129 (Ky. 1926)). Additionally, a contract, including a contract to arbitrate, must contain "definite and certain terms" to be enforceable. *Kovacs v. Freeman*, 957 S.W.2d 251, 254 (Ky. 1997). The Kentucky Court of Appeals recently reaffirmed the legal principle that "[i]n situations where an authorized agent signs a written agreement in the name of a company, but the company's name does not appear in the body of the contract, it is improper for the trial court to determine, as a matter of law, that the company was not a party to the contract. *Cox v. Ford*, No. 2014-CA-000961-MR, 2015 WL 9413404, at *2 (citing *Miller v. Johns*, 163 S.W.2d 9, 11 (Ky. 1942)). The court went on to state that "[t]he contract of the agent is the contract of the principal, and he may sue or be sued thereon, though not named therein." *Id.* (quoting *Ford v. Williams*, 62 U.S. 287, 289 (1858)).

The first paragraph of the Arbitration Agreement at issue states that the agreement is between the nursing facility referred to as "the Center" and the resident. (Docket No. 15-1 at 1.) Under the Definitions section, the Center is defined as "the nursing facility, its employees, agents, officers, and directors." *Id.* Furthermore, Ms. Darla Joiner signed the agreement as the Center's agent. *Id.* at 5. Ms. Joiner bound the Plaintiffs, as their agent, to arbitration. *Id.* Therefore, the Court finds that the parties are sufficiently identified and definite as a matter of law.

### III. Preliminary Injunction

The final issue before the Court at this time is the Plaintiffs' Motion for a Preliminary Injunction. The Plaintiffs request that this Court issue a Preliminary Injunction to enjoin Ms.

Crocker from prosecuting her state court action pending this Court's adjudication of Ms. Crocker's counterclaims concerning the validity of the Arbitration Agreement. (Docket No. 50.)

When considering whether or not to issue a preliminary injunction, the court must consider and balance the following four factors:

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005) (citing *PACCAR Inc. v. TeleScan Techs., L.L.C.*, 319 F.3d 243, 249 (6th Cir. 2003)). "These four considerations are factors to be balanced, not prerequisites that must be met." *Abercrombie & Fitch v. Fashion Shops of Kentucky, Inc.*, 363 F. Supp. 2d 952, 958 (S.D. Ohio 2005) (citing *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985)). The issuance of a preliminary injunction is "an extraordinary remedy involving the exercise of a very far-reaching power." *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 757 (E.D. Mich. 2003) (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)). "It is because preliminary injunctive relief is such a 'drastic' remedy that plaintiffs must show circumstances clearly demand its entry." *Id.* (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

In response to the Plaintiffs' Motion, Ms. Crocker argues that the Court may not grant a preliminary injunction because doing so would violate the Anti-Injunction Act. (Docket No. 53 at 3-16.) The Anti-Injunction Act states that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C § 2283. The FAA "requires courts to stay their own proceedings where the issues to be litigated are

subject to an agreement to arbitrate, 9 U.S.C. § 3, [but] it does not specifically authorize federal courts to stay proceedings pending in state courts." *Great Earth Companies, Inc. v. Simons*, 288 F.3d 878, 893-94 (6th Cir. 2002) (quoting *Ultracashmere House, Ltd. v. Meyer*, 664 F.2d 1176, 1180 (11th Cir. 1981), *overruled on other grounds* by *Baltin v. Alaron Trading Corp.*, 128 F.3d 1466 (11th Cir. 1997)) (internal quotation marks omitted). As a result, a "district court's authority to enjoin state-court proceedings is subject to the legal and equitable standards for injunctions generally, including the Anti-Injunction Act." *Id.* at 894. Importantly, the three enumerated exceptions to the Anti-Injunction Act "are narrow in their application and should not be enlarged by loose statutory construction." *Id.* (quoting *Hatcher v. Avis Rent–A–Car Sys., Inc.*, 152 F.3d 540, 542 (6th Cir. 1998) (internal quotation marks omitted). The Sixth Circuit Court of Appeals has found that a district court does not violate the Anti-Injunction Act by enjoining parallel state court proceedings *after* it has compelled arbitration. *Id.*; *see also Salyersville Health Facilities, LP v. Fletcher*, No. CV 15-81-ART-EBA, 2015 WL 9424145, at *3 (E.D. Ky. Dec. 22, 2015). The Sixth Circuit reasoned that such an injunction "falls within the exception for injunctions 'necessary to protect or effectuate [the district court's] judgments' . . . often referred to as the re-litigation exception." *Id.*

Here, however, the Plaintiffs ask this Court to enjoin the parallel state court action until such time as this Court resolves Ms. Crocker's counterclaims concerning the validity of the Arbitration Agreement and determines whether or not this dispute is arbitrable. For this Court to grant such a request would be unprecedented and in direct violation of the Anti-Injunction Act as none of the three enumerated exceptions to the Anti-Injunction Act apply. *See Erie Operating, LLC v. Foster*, No. CA 14-72, 2015 WL 4077453, at *3 (W.D. Pa. July 6, 2015); *Patriot Mfg.,*

*Inc. v. Dixon*, No. CIV.A.05-0321-WS-M, 2005 WL 2233071, at \*11-13 (S.D. Ala. Sept. 1, 2005).[4]

The Anti-Injunction Act "rests on the fundamental constitutional independence of the States and their courts, and its purpose is to make the dual system of state and federal courts work without needless friction." *Zurich Am. Ins. Co. v. Superior Court for State of California*, 326 F.3d 816, 824 (7th Cir. 2003) (quoting *Atlantic Coast Line R.R. Co. v. Broth. of Locomotive Eng'rs.*, 398 U.S. 281, 286–87 (1970)). The Act also "evidences confidence in state courts." *Id.* at 826 (quoting *Commonwealth Edison Co. v. Gulf Oil Corp.*, 541 F.2d 1263, 1274 (7th Cir. 1976)). In order to prevent lower federal courts from frequently and needlessly intervening in state court matters, the United States Supreme Court has cautioned lower courts that they do not "have inherent power to ignore the limitations of § 2283 and to enjoin state court proceedings merely because those proceedings interfere with a protected federal right or invade an area preempted by federal law, even when the interference is unmistakably clear." *Atl. Coast Line R. Co. v. Bhd. of Locomotive Engineers*, 398 U.S. 281, 294 (1970). Additionally, the Court has commanded that "[a]ny doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed." *Id.* at 297.

---

[4] In their Reply, the Plaintiffs argue that the "necessary in aid of its jurisdiction" and "necessary to protect or effectuate judgment" exceptions apply. First, the "necessary in aid of its jurisdiction" exception applies only "to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case." *Atl. Coast Line*, 398 U.S at 295. "Historically, this exception applied only to *in rem* rather than *in personam* proceedings." *Zurich Am. Ins.*, 326 F.3d at 825. While there has been limited expansion of this exception, "in the context of school desegregation cases . . . and consolidated multidistrict litigation," this case obviously does not involve either school desegregation or multidistrict litigation and does not warrant an expansion of this exception. *Id.* With regards to the "necessary to protect or effectuate judgment" exception," this Court finds that it is also not applicable in this case. That exception is "founded in the well-recognized concepts of res judicata and collateral estoppel and was designed to permit a federal court to prevent state litigation of an issue that previously was presented to and decided by the federal court." *Erie Operating, LLC*, 2015 WL 4077453, at \*4 (quoting *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 147 (1988). This Court has yet to decide whether or not the parties should be compelled to arbitrate the Defendant's state court claims under the FAA. Therefore, this exception is not applicable.

In her Response, Ms. Crocker notes that the Trigg County Circuit Court entered an order the day after the Plaintiffs filed their Motion for a Preliminary Injunction finding that the Arbitration Agreement is unenforceable as a matter of law. (Docket No. 53.) In making its determination regarding the enforceability of the Arbitration Agreement, the Trigg County Circuit Court relied on the Kentucky Supreme Court's decisions in *Ping* and *Whisman*. (Docket No. 53-1 at 2.) While this Court has already determined that the rule the Kentucky Supreme Court articulated in *Whisman* violates the FAA and is therefore preempted by federal law, the Anti-Injunction Act and United States Supreme Court forbid this Court from enjoining the state court action. The state court's application of a state law that "invade[s] an area preempted by federal law" does not give this Court the power to enjoin the state court action. *See Atl. Coast Line*, 398 U.S. at 294. The Plaintiffs' requested injunction would plainly violate the Anti-Injunction Act, and, therefore, their Motion for a Preliminary Injunction must be denied.

## Conclusion and Order

The following Order is in compliance with the above Memorandum and Opinion:

**IT IS ORDERED:**

Plaintiffs' Motion to Strike Defendant's Counterclaims and to Quash Issuance of Summons to Nonparties is **DENIED**. (Docket No. 10.)

Plaintiffs' Motion to Compel Arbitration or in the Alternative to Dismiss Defendant's Counterclaims is **DENIED**. (Docket No. 15).

Defendant's Motion to Dismiss pursuant to Rule 12(b)(7) is **DENIED**. (Docket No. 17.)

Counter-Defendant Darla Joiner's Motion to Dismiss and to Quash Issuance of Summons is **DENIED**. (Docket No. 18.)

Defendant's Motion for Summary Judgment as to her Counterclaim for Fraud is **DENIED**. (Docket No. 24.)

Defendant's Motion for Summary Judgment as to the Constitutionality of the FAA is **DENIED**. (Docket No. 27.)

Counter-Defendant Dawn Tedder's Motion to Dismiss and to Quash Issuance of Summons is **DENIED**. (Docket No. 28.)

Plaintiffs' Motion for Extension of Time to File Reply in Support of Motion to Quash and Dismiss is **DENIED** as **MOOT**. (Docket No. 42.)

Defendant's Motion for a Hearing is **DENIED** at this time. (Docket No. 39.)

Plaintiffs' Motion for a Preliminary Injunction is **DENIED**. (Docket No. 50.)

As this Court has already found the Kentucky Supreme Court's ruling in *Whisman* violates the FAA and will not consider it as authoritative, Plaintiffs' Motion for Leave to File Supplemental Pleadings is **DENIED**.

As the parties have provided extensive briefing in this case and the Court does not believe that it would be assisted by any further briefing on the issues before it, the Defendant's Motions for Leave to File a Sur-Reply are **DENIED**. (Docket Nos. 47; 52.)

Lastly, the Court will **HOLD** in **ABEYANCE** Counter-Defendant Preferred Care Health Facilities, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction. The Court will discuss this Motion with the parties during a **telephonic conference** on **March 30, 2016 at 9:00 AM Central** time. The Court will place the call to counsel. (Docket No. 19.)

cc: Counsel